## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

**CHRISTOPHER VICKERS**
c/o 2515 River Downs
Stow, Ohio 44224

     Plaintiff,

     v.

**FAIRFIELD MEDICAL CENTER**
401 North Ewing Street
Lancaster, Ohio 43130

**STEVE ANDERSON**
7800 E. Bowling Green Lane
Lancaster, Ohio 43130

**KORY J. DIXON**
221 West Market Street
Baltimore, Ohio 43105

**JOHN MUELLER**
940 West Rushville Road
Lancaster, Ohio 43130

**"JANE DOE" DIXON**
 **Spouse of Defendant KORY DIXON**
221 West Market Street
Baltimore, Ohio 43105

     and,

**ONE OR MORE AS-YET
UNIDENTIFIED PERSONS**

     Defendants

CASE NO.  C2-03-858

JUDGE:  FROST

MAGISTRAGE JUDGE ABEL

**COMPLAINT**
(Demand for Jury Trial Stated Herein)

Plaintiff, CHRISTOPHER VICKERS, by and through counsel, states for his

Complaint the following:

## INTRODUCTION

1.   This is a civil rights action brought by an individual Plaintiff against his former

employer and several individual co-worker defendants for multiple acts of sexual

harassment and sex discrimination beginning in March of 2002.  Plaintiff notified

his superior of the sexual harassment to which he was being subjected by his co-

workers.  Instead of attempting to remedy the harassment, Plaintiff's supervisor

joined in the harassing behavior.  Thereafter, Plaintiff's co-workers increased the

frequency and severity of the sexual harassment, encouraged and aided by the

supervisor's indifference and, at times, by his active participation.  Plaintiff

engaged legal counsel for the purpose of ending the harassment.  Defendant

employer purported to punish Plaintiff's supervisor and co-workers by suspending

them from work, but instead merely arranged for their alternative employment

during the putative suspension period.  Defendants continued to maintain a hostile

working environment and initiated retaliatory, pretextual disciplinary action

against Plaintiff until Plaintiff felt compelled to resign on or about May 5, 2003.

In addition to Plaintiff's claims under federal law, Plaintiff's action also includes

pendent tort claims under Ohio state statutory and common laws.

## PARTIES

2.    Plaintiff, CHRISTOPHER VICKERS (hereinafter  Plaintiff  or  Vickers ), is an

individual and a citizen of the State of Ohio.

3.    Vickers was employed by FAIRFIELD MEDICAL CENTER (hereinafter

 FMC ), as a police officer.

4.    Defendant FMC is an Ohio corporation located in Lancaster, Ohio.

5.    Defendant STEVE ANDERSON (hereinafter "Anderson") was, at all times

material to this action, an employee of FMC and served in the capacity of Police

Chief of FMC's Police Department (hereinafter "FMCPD").

6.    Defendant KORY DIXON (hereinafter "Dixon") was, at all times material to this

action, an employee of FMC and served as an FMCPD police officer.

7.    Defendant JOHN MUELLER (hereinafter "Mueller") was, at all times material to

this action, an employee of FMC and served as an FMCPD police officer.

8.    Defendant "JANE DOE" DIXON is the yet-unidentified spouse of Defendant

KORY DIXON and was, at all times material to this action, an employee of Grant

Medical Center.

9.    Plaintiff alleges, on information and belief, that there are also one or more as-yet-

unnamed defendants, in capacities yet to be determined, who wrongfully aided,

abetted, and/or facilitated the named Defendants in committing the violations of

federal and state laws alleged herein.

-3-

## **CLAIMS**

10.  Plaintiff asserts the following claims:

    A)    <u>COUNT I - TITLE 42 U.S.C. § 2000e-2 ( TITLE VII ): SEX DISCRIMINATION</u> - for unlawful discrimination on the basis of sex and/or sex stereotyping;

    B)    <u>COUNT II - TITLE VII: SEXUAL HARASSMENT</u> - for Defendants' unlawful fostering, maintenance, and/or perpetuation of a hostile working environment on the basis of sex;

    C)    <u>COUNT III - TITLE VII: SEX DISCRIMINATION</u> - for unlawful discrimination in retaliation for Vickers' participation in protected activity, to wit: engaging legal counsel for the purpose of investigating the unlawful sex discrimination and hostile working environment to which he was subjected by FMC; and for engaging in activities - either personally or through counsel - intended to remediate same.

    D)    <u>COUNT IV - TITLE 42 U.S.C. § 1985(3) ("Section 1985")</u> - for conspiring to deprive Plaintiff of the equal protection of the laws by reason of Plaintiff's sex, to include sex stereotyping;

    E)    <u>COUNT V - TITLE 42 U.S.C. § 1986 ("Section 1986")</u> - for knowing that two or more persons were conspiring to deprive Plaintiff of the equal

protection of the laws and, having the power to prevent or to aid in preventing the commission of such deprivation, neglecting or refusing so to do;

F)  COUNT VI - OHIO REVISED CODE CHAPTER 4112 ("ORC § 4112"): SEX DISCRIMINATION - for unlawful discrimination on the basis of sex and/or sex stereotyping - as determined by Title VII and the case law interpretations thereof;

G)  COUNT VII - O.R.C. § 4112: RETALIATION - for unlawful retaliation against Plaintiff - as determined by Title VII and the case law interpretations thereof - in response to Plaintiff's participation in protected activity, to wit: engaging legal counsel for the purpose of investigating the unlawful sex discrimination and hostile working environment to which he was subjected by FMC; and for engaging in activities - either personally or through counsel - intended to remediate same.

H)  COUNT VIII - O.R.C. § 4112: SEXUAL HARASSMENT - for unlawful creation and perpetuation of a hostile work environment on the basis of sex - as determined by Title VII and the case law interpretations thereof;

I)  COUNT IX - OHIO COMMON LAW TORT OF BATTERY - for Defendant Dixon's intentional, wrongful, unpermitted, and unwanted

-5-

offensive touching of Plaintiff while simulating performing anal sex on him.

J) <u>COUNT X - OHIO COMMON LAW TORT OF BATTERY</u> - for Defendant Dixon's intentional, wrongful, unpermitted, and unwanted offensive touching of Plaintiff by approaching Plaintiff from behind, grabbing Plaintiff's breast, and saying to others present, *"Look, Guys, Kiss has titties."*

K) <u>COUNT XI - OHIO COMMON LAW TORT OF BATTERY</u> - for Defendant Mueller's intentional, wrongful, unpermitted, and unwanted offensive touching of Plaintiff by attempting to push a feminine sanitary napkin into Plaintiff's face and then taping same to Plaintiff's jacket with which Plaintiff was in contact.

L) <u>COUNT XII - OHIO COMMON LAW TORT OF BATTERY</u> - for Defendants' intentional, wrongful, unpermitted, unprivileged, and unwanted offensive touching of Plaintiff by causing Plaintiff to unknowingly ingest the drug benzocaine, which Defendants had placed in Plaintiff's food and/or drink for the purpose of affecting Plaintiff thereby;

M) <u>COUNT XIII - OHIO COMMON LAW TORT OF BATTERY</u> - for Defendants' intentional, wrongful, unpermitted, unprivileged, and unwanted offensive touching of Plaintiff by placing a trichome-based irritant into the

-6-

sleeves of Plaintiff's uniform jacket, thereby causing Plaintiff intense

itching and burning sensations when wearing same;

N) COUNT XIV - OHIO COMMON LAW TORT OF BATTERY - for

Defendant Mueller's intentionally offensive physical contact with the person

of the Plaintiff, to wit: Mueller's multiple acts of touching of Plaintiff's

crotch and genital areas with a tape measure despite Plaintiff's insistence to

the contrary;

O) COUNT XV - OHIO COMMON LAW TORT OF BATTERY - for

Defendant Dixon's intentionally offensive physical contact with the person

of the Plaintiff, to wit: Dixon's forcibly contacting Plaintiff's crotch and

genital areas with a "Barney" doll despite Plaintiff's insistence to the

contrary;

P) COUNT XVI - OHIO COMMON LAW TORT OF CONSTRUCTIVE

DISCHARGE -for Defendants' cumulative actions - through a pattern and

practice of severe sexual harassment, intimidation, corruption, and battery -

which made working conditions so intolerable under the circumstances that

Plaintiff felt compelled to resign.

Q) COUNT XVII - OHIO COMMON LAW TORT OF INVASION OF

PRIVACY - for Defendants' intentional public disclosure of highly

offensive and objectionable facts concerning Plaintiff's private life, namely

-7-

the fact that Plaintiff was sexually molested during his childhood, which facts were of no legitimate concern to the public.

R)  COUNT XVIII - OHIO COMMON LAW TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ( IIED ) - for Defendants' extreme and outrageous actions which Defendants either intended, knew, or should have known would cause the serious mental anguish that Plaintiff proximately suffered as a result thereof;

S)  COUNT XIX - THE OHIO COMMON-LAW TORT OF DEFAMATION BY LIBEL - for Defendants' multiple public oral statements falsely alleging or implying that Plaintiff was engaged in a homosexual sexual relationship with an underage FMC employee, thereby causing injury to Plaintiff's reputation; exposing Plaintiff to public hatred, contempt, ridicule, shame or disgrace; and/or affecting him adversely in his profession;

T)  COUNT XX - THE OHIO COMMON-LAW TORT OF DEFAMATION BY LIBEL - for Defendants' multiple public written statements falsely alleging or implying that Plaintiff was engaged in a homosexual sexual relationship with an underage FMC employee, thereby causing injury to Plaintiff's reputation; exposing Plaintiff to public hatred, contempt, ridicule, shame or disgrace; and/or affecting him adversely in his profession.

U) <u>COUNT XXI - THE OHIO COMMON-LAW TORT OF DEFAMATION BY SLANDER</u> - for Defendants' multiple public oral statements falsely alleging or implying that Plaintiff wantonly and indiscriminately engaged in homosexual acts with strangers or mere acquaintances, thereby causing injury to Plaintiff's reputation; exposing Plaintiff to public hatred, contempt, ridicule, shame or disgrace; and/or affecting him adversely in his profession;

V) <u>COUNT XXII - THE OHIO COMMON-LAW TORT OF DEFAMATION BY LIBEL</u> - for Defendants' acts of taking a photograph of Defendant Dixon simulating performing anal sex on Plaintiff and then publishing and/or distributing same, thereby causing injury to Plaintiff's reputation; exposing Plaintiff to public hatred, contempt, ridicule, shame or disgrace; and/or affecting him adversely in his profession.

W) <u>COUNT XXIII - THE OHIO COMMON-LAW TORT OF NEGLIGENCE</u> - for Defendants' negligent hiring, supervision and retention of Defendant Dixon.

X) <u>COUNT XXIV - THE OHIO COMMON-LAW TORT OF NEGLIGENCE</u> - for Defendants' negligent supervision and retention of Defendant Mueller.

Y) <u>COUNT XXV - THE OHIO COMMON-LAW TORT OF FALSE IMPRISONMENT</u> - for Dixon's wrongful physical restraint of Plaintiff

-9-

during handcuff training, which restraint extended well beyond the period
of time necessary for training purposes, and during which unlawful restraint
Dixon subjected Plaintiff to humiliating and degrading sexual abuse, to wit:
simulated anal intercourse accompanied by "humping" Plaintiff's buttocks
and making physical contact therewith.

Z)    COUNT XXVI - THE OHIO COMMON-LAW TORT OF FALSE
      IMPRISONMENT - for Dixon's wrongful physical restraint of Plaintiff
      during handcuff training (on a separate occasion), which restraint extended
      well beyond the period of time necessary for training purposes, and during
      which unlawful restraint Dixon subjected Plaintiff to humiliating and
      degrading sexual abuse, to wit: Dixon attempted with his hands to force
      Plaintiff's head down into Dixon's crotch, thereby attempting to simulate
      Plaintiff performing oral sex on Dixon.

**LIABILITY**

11.   Plaintiff asserts liability for the aforesaid multiple claims against the applicable
      Defendants, jointly and severally, as follows:

A)    COUNT I - TITLE VII SEX DISCRIMINATION - Defendants FMC,
      Anderson, Dixon, and any as-yet unidentified Defendants in their corporate
      capacities;

-10-

B) <u>COUNT II - TITLE VII SEXUAL HARASSMENT</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants in their corporate capacities;

C) <u>COUNT III - TITLE VII SEX DISCRIMINATION/RETALIATION</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants in their corporate capacities;

D) <u>COUNT IV - TITLE 42 U.S.C. § 1985</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

E) <u>COUNT V - TITLE 42 U.S.C. § 1986</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

F) <u>COUNT VI - ORC § 4112 SEX DISCRIMINATION</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

G) <u>COUNT VII - O.R.C. § 4112 RETALIATION</u> - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

H)   COUNT VIII - O.R.C. § 4112 SEXUAL HARASSMENT - Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

I)   COUNT IX - OHIO COMMON LAW TORT OF BATTERY - Defendant Dixon, personally;

J)   COUNT X - OHIO COMMON LAW TORT OF BATTERY - Defendant Dixon, Personally;

K)   COUNT XI - OHIO COMMON LAW TORT OF BATTERY - Defendant Mueller, personally;

L)   COUNT XII - OHIO COMMON LAW TORT OF BATTERY - Defendant Mueller, personally;

M)   COUNT XIII - OHIO COMMON LAW TORT OF BATTERY - Defendants FMC, Anderson, Dixon,and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

N)   COUNT XIV - OHIO COMMON LAW TORT OF BATTERY - Defendant Mueller, personally;

O)   COUNT XV - OHIO COMMON LAW TORT OF BATTERY - Defendant Dixon, personally;

P)   COUNT XVI - OHIO COMMON LAW TORT OF CONSTRUCTIVE DISCHARGE - Defendant FMC;

-12-

Q)     <u>COUNT XVII - OHIO COMMON LAW TORT OF INVASION OF</u>

       <u>PRIVACY</u> - Defendant Anderson and any as-yet unidentified Defendants,

       in both personal and corporate capacities, as applicable;

R)     <u>COUNT XVIII -  OHIO COMMON LAW TORT OF INTENTIONAL</u>

       <u>INFLICTION OF EMOTIONAL DISTRESS ( IIED )</u> -  All Defendants in

       both personal and corporate capacities, as applicable;

S)     <u>COUNT XIX - THE OHIO COMMON-LAW TORT OF DEFAMATION</u> -

       Defendants FMC, Anderson, Dixon, and any as-yet unidentified

       Defendants, in both personal and corporate capacities, as applicable;

T)     <u>COUNT XX - THE OHIO COMMON-LAW TORT OF DEFAMATION</u>

       <u>BY LIBEL</u> - Defendants FMC, Anderson, Dixon, and any as-yet

       unidentified Defendants, in both personal and corporate capacities, as

       applicable;

U)     <u>COUNT XXI - THE OHIO COMMON-LAW TORT OF DEFAMATION</u>

       <u>BY SLANDER</u>  - Defendants FMC, Anderson, Dixon, and any as-yet

       unidentified Defendants, in both personal and corporate capacities, as

       applicable;

V)     <u>COUNT XXII - THE OHIO COMMON-LAW TORT OF DEFAMATION</u>

       <u>BY LIBEL</u> - Defendants Anderson, Dixon, "Jane Doe" Dixon, and any as-

-13-

yet unidentified Defendants, in both personal and corporate capacities, as applicable;

W)   COUNT XXIII - THE OHIO COMMON-LAW TORT OF NEGLIGENCE - Defendants FMC, Anderson, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

X)   COUNT XXIV - THE OHIO COMMON-LAW TORT OF NEGLIGENCE Defendants FMC, Anderson, Dixon, and any as-yet unidentified Defendants, in both personal and corporate capacities, as applicable;

Y)   COUNT XXV - THE OHIO COMMON-LAW TORT OF FALSE IMPRISONMENT - Defendant Dixon, personally;

Z)   COUNT XXVI - THE OHIO COMMON-LAW TORT OF FALSE IMPRISONMENT - Defendant Dixon, personally.

## JURISDICTION

12.   This Court has jurisdiction over Counts I - V of this action under 28 USC §§ 1343.

13.   This Court has pendent jurisdiction over Counts VI - VIII of this action which are statutory claims under Ohio law.

14.   This Court has pendent jurisdiction over Counts IX - XXVI of this action, which are tort claims under Ohio Common Law.

-14-

## STATEMENT OF FACTS

15. In March of 2002, while a police officer with FMC, Vickers investigated allegations of sexual misconduct against a male doctor at FMC. The complainant was a male medic. In the course of the investigation it became known to the other members of the FMC police force that the complainant was gay; that Vickers had befriended him, and that Vickers was assisting him by investigating his allegations of sexual misconduct by a male doctor.

16. Upon learning of the foregoing facts Dixon and Mueller began making sexually based slurs and discriminating remarks and comments about Vickers, alleging that Vickers was "gay" or homosexual, and questioning his masculinity.

17. Vickers never discussed either his sexuality or intimate details of his private life with his co-workers at FMC.

18. Vickers took a four-day vacation in April, 2002, and went to Florida with a friend and former roommate, who also happened to be male. Upon learning of the above details of Vickers' vacation Dixon and Mueller increased the frequency and severity of their sexually abusive behavior. For example, they asked Vickers, *"How were the boys on South Beach?[1]" "Did you pick up any guys while you were there?"*

---

[1] South Beach is a Florida community well-known for being very gay (homosexual) friendly. See Plaintiff's Exhibit 1, attached.

19.     Anderson witnessed Dixon's and Mueller's harassment of Vickers.  Instead of

taking action to quell the harassment and remedy the situation, Anderson joined in

the harassment, saying *"Ahh, Chris went to South Beach,"* and asking Vickers, *"so

you and Jason went to South Beach.  How many guys did you pick up?"*  All three

individual Defendants continued to ask questions and make snide comments

suggesting that Vickers regularly engaged in non-stereotypical behavior for men,

such as having sex with men rather than women.  This pattern of harassment

continued unabated from May through October of 2002.  Dixon and Mueller were

the primary harassers, but Anderson joined in on a frequent and regular basis.

20.     In August of 2002 Vickers befriended a 17-year-old male FMC employee, named

Josh, who aspired to become a police officer.  Dixon and Mueller began harassing

Vickers by making comments implying that Josh was Vickers' "boyfriend" and that

Vickers was having sex with Josh.  Their constant suggestions of sexual activity

between Vickers and Josh also contained implications of felonious behavior

(pedophilia) because Josh was a minor.  Anderson joined Dixon and Mueller in

this harassment from time to time as well.

21.     Vickers went on vacation during the period of September 12-16, 2002.  Prior to

departing he locked his firearm in the FMCPD gun safe. He also left his law

enforcement equipment at the department while away on vacation.

-16-

22.   Upon his return to work from his vacation, Vickers unlocked and opened the FMCPD gun safe and discovered that his coworkers had disassembled his firearm and left it in pieces.  Vickers visually inspected his law enforcement equipment, but it appeared to be in working order.

23.   It soon became apparent, however, that Vickers' equipment had also been tampered with.  On September 28, 2002, Vickers arrested one Flo Hanson for criminal trespassing.  While attempting to handcuff Ms. Hanson, Vickers discovered that someone had double-locked his handcuffs.  This rendered the handcuffs not only unusable in the customary one-handed mode, but unusable at all until unlocked with a handcuff key.  Unlocking the handcuffs with a handcuff key required the use of two hands, and Vickers had to temporarily take both of his hands off of the arrestee - thereby placing him in a potentially dangerous situation.

24.   Vickers complained about the sabotage of his firearm and equipment to Anderson, but Anderson never took any remedial action in response to stop or curb the harassment.

25.   Later that same day, September 28, 2002, Vickers discovered that someone had impressed the word "FAG" on all of his two-part, pressure-sensitive report forms so that the top copy appeared unaltered, but the second page had the epithet boldly emblazoned on it.

26.  On or about September 18th or 19th,  2002, Vickers had a day off from work and decided to travel to Indianapolis, Indiana, to visit some friends.  One of these friends was named Jason Johnson. Vickers was in the company of Jason and another friend, named Angela, at approximately midnight on September 19, 2002. He decided to call FMCPD to find out what time he had to be back to work the next day.

27.  Vickers used Jason's cellular telephone to place the call.  Dixon was on duty at the time and answered Vickers' call.

28.  Dixon began ridiculing Vickers during the phone conversation, referring to Vickers as a "fag".

29.  Angela was aware of the conversation and decided to talk directly to Dixon because she was tired of hearing him make derogatory comments to Vickers. Vickers gave Angela the telephone, and she began talking to Dixon.

30.  The conversation between Angela and Dixon was audible to Vickers, and he could hear Dixon ask Angela vulgar, offensive, sex-based questions such as *"Do you shave your puss?"  "Do you lick pussy?"  "Did you know Chris [Vickers] was a fag?"* and *"Chris [Vickers] sucks dick."*

31.  A few minutes after the phone conversation with Dixon on Jason's cellular phone ended, Jason received a text message on his phone which read: *"Jason this is*

-18-

*Chris, I love you."* The caller ID feature showed that the text message call

originated from the FMCPD telephone.

32.  Upon returning from Indianapolis Vickers learned that Anderson had recorded the

telephone conversation between Angela and Dixon on the FMCPD office speaker

phone.  Vickers asked Anderson about it, and Anderson showed Vickers the

audiotape on which the conversation was recorded.  Anderson also played the tape

for Vickers.  Vickers also learned that, after recording the conversation on the

office speaker phone, Anderson played the tape for other FMCPD officers so that

they could hear the conversation, make jokes about it, and comment on Vickers'

alleged homosexuality.

33.  Dixon's harassment of Vickers escalated to include physical acts as well as verbal

harassment.  On or about October 20, 2002, Vickers and Mueller we were

conducting some impromptu handcuff training, whereby Mueller attempted to

handcuff Vickers, and Vickers played the role of a resisting arrestee.   As soon as

Mueller managed to get Vickers fully cuffed, Mueller immediately released

Vickers from the restraints.  Dixon then entered and wanted to attempt to cuff

Vickers as well.  Once Dixon had fully cuffed Vickers' hands behind Vickers'

back, however, he did not release Vickers from the restraints.

34.  While Dixon had Vickers restrained, he stood behind Vickers, pulled Vickers'

arms upward, slipped his own head under and inside of Vickers' arms, placed his

head on Vickers' back, and proceeded to "mount" or "hump" Vickers' buttocks. Dixon thrust his pelvis forward against Vickers' buttocks repeatedly, simulating having anal sex with Vickers.

35. While Dixon was sexually assaulting the restrained Vickers, Mueller and Anderson looked on, laughing. Anderson retrieved the FMCPD digital camera and took a picture of Vickers being assaulted by Dixon. After a few minutes Dixon finally released Vickers from the handcuff restraints, but only after making some vicious anti-gay remarks to Vickers. Vickers noted afterward that he had sustained four (4) bruises on or around his wrists as a result of Dixon's cuffing and abuse.

36. Later that day Vickers downloaded and printed the digital "anal sex" photo taken of him in handcuffs with Dixon behind him simulating anal sex. He placed it in his personal mailbox at the FMCPD intending to take it home later. Someone took it from his mailbox, however, and despite his demands of Anderson and others on duty that it be returned, it was not.

37. A few weeks later Vickers was on duty with Dixon. Dixon was speaking to his wife on the telephone. Vickers understands, upon information and belief, that Dixon's wife works as a nurse or in a clerical position at Grant Medical Center. Vickers heard Dixon tell his wife to fax a picture over to him. A few minutes later the "anal sex" photograph was faxed into FMCs Registration center, where

-20-

everyone on duty there could see it.  Dixon showed the photo to several people in the Registration center, including Debbie Bargy and Lori Emerick.

38.  On October 21, 2002, Vickers arrived for his shift at FMCPD and discovered that someone had altered the FMCPD computer program so that an icon depicting a large cartoon of a blue bird would periodically pop up onto the computer screen and say vocally *"One Second Gay Chris and Josh!  I'll check now!"* The icon also depicted a "word balloon" with the foregoing statement printed in it so that it could be read.

39.  The icon remained on the FMCPD computer for approximately one month and was readily seen by any visitors, officers, and staff entering the office during that period.

40.  Anderson attempted to remove the icon from the FMCPD computer, but he was unsuccessful.  He finally had to have a specialist from outside the FMCPD come in to remove the icon.  Anderson told Vickers that Dixon had installed the icon on the FMCPD computer.  Anderson laughed about the incident.

41.  On October 23, 2002, Vickers was in the FMCPD office with another officer, Ken Darst.  Anderson entered the office and told Vickers, *"Hey, boy have I got the scoop on you!"*  In front of Darst, Anderson then went on to say, *"I heard that you used to live with a guy in Marion, you and he owned a house together, and your mom and dad came up and rescued you from that situation.  I also heard that you*

-21-

*were fired from the dog pound in Logan, and you were hired back and had to*

*resign or be fired, and I also heard that you were gay, that your uncle made you*

*that way because you were molested as a child!"*

42.    Vickers was stunned, upset, and furious with Anderson, and told him so.

Anderson just laughed and continued to deride Vickers with jokes about his

newfound "scoop" of information. Darst said, *"Woo, this is too thick for me"* and

left the office.

43.    Vickers attempted to discuss the matter, and how upset he was about it, with

Anderson on several occasions. However, Anderson either just ignored Vickers or

he ridiculed him with jokes about the incident. Vickers also contacted former

employers to refute the allegation that Vickers had been fired form his

employment, but Anderson would not speak with them even after Vickers got them

on the telephone and they were willing to speak with Anderson.

44.    Dixon and Mueller continued to harass Vickers, calling him gay, making lewd

gestures and giving him leering looks in front of others. On October 28, 2002,

Dixon was sitting behind Vickers while the two of them were attending training

with the Lancaster, Ohio, Police Department (hereinafter "LPD"), and Dixon made

comments alleging Vickers was gay.

45.    On October 31, 2002, Dixon, Vickers, and Darst were finishing their training with

the LPD. Instructor Mark Churchill was conducting a critical evaluation of

Vickers' ability to administer a portion of a field sobriety test, the horizontal gaze nystagmus (HGN) exam. Dixon served as the test subject.

46. The HGN must be administered face-to-face in very close proximity to the test subject. It requires the tester to look directly at the subject's eyes to observe for nystagmus movements during the exam. When Vickers attempted to administer the test to Dixon, Dixon acted in a very overtly sexual manner, sticking out his tongue at Vickers while making lewd and disgusting gestures. Darst was present to observe this, and Mark Churchill had to tell Dixon to *"knock it off."*

47. On November 15, 2002, Vickers found a "rainbow sticker"[2] attached to his personal FMCPD mailbox. While investigating the matter Vickers spoke with FMCPD Officer Rich Storts, who advised Vickers that he had seen a card with Vickers' name written on it affixed to a bulletin board. Attached to the card was the same kind of rainbow sticker.

48. On or about November 17 or 18, 2002, Vickers brought food and drink from the FMC cafeteria into the FMCPD office. Dixon and Anderson were both also on duty, but Anderson was elsewhere on the premises. Without Vickers' knowledge Dixon placed a topical anesthetic in Vickers' drink. As Vickers consumed his food

---

[2] A rainbow sticker is a sticker depicting the colors of the rainbow. It is a symbol of the Gay Pride movement and encourages acceptance of all forms of diversity.

and drink his mouth and throat became numb, and he realized that his food had been tampered with.

49. Vickers called Anderson to the office and complained to him about the incident. Anderson did nothing to investigate the matter or follow up on it. Dixon later admitted to having obtained a form of Benzocaine from the FMC Emergency Room and putting it in Vickers' drink. Anderson found the incident amusing and laughed about it.

50. Vickers was very upset about the treatment and harassment he had been receiving from his coworkers. He was also furious that Anderson not only refused to investigate Vickers' complaints or take them seriously, but that he actively participated and encouraged the harassment. Vickers resolved to report the matter to FMC Vice President Howard Sniderman or FMC President Mine Ubbing.

51. Anderson apparently became aware of Vickers' plans before Vickers could act on his intent to report the matter to upper management. Anderson confronted Vickers in the FMCPD office - in front of Dixon - stating, *"You can go to Howard (Sniderman), he's waiting for you. I told him what's going on, so if you think it will do you any good, go ahead."*

52. Anderson then asked Vickers, *"What do you think it will get you if you do go to Howard?"* Vickers answered, *"Probably nothing."* Anderson responded, *"You're right."*

53.    After Anderson's confrontation Dixon and Mueller increased their harassing behavior.  They began addressing Vickers as *"Kiss"* instead of *"Chris"*.

54.    On December 27, 2002, Vickers discovered that Dixon had changed Vickers' work schedule without informing him.  Vickers left Dixon a note asking for at least the courtesy of a request and notification before Dixon changed his work schedule.  Vickers posted the note on the officers' schedule, where it remained for at least two days and was observable by all of the FMCPD officers.

55.    On December 30, 2002, Vickers reported for work and discovered that someone had written the word *"NO"* on the note beside Vickers' name.  They had also drawn a crude picture of a penis going into a mouth.  The note stayed up until Dixon and Mueller left for the day.  Before they left they shredded it.

56.    Dixon's and Mueller's harassment of Vickers continued to escalate until they were a constant occurrence.  On January 5, 2003, at approximately 8:40 PM, Vickers, Anderson, Dixon, and a woman named Vicki (from FMC Housekeeping) were sitting in the FMCPD office.  Dixon began edging his seat to be closer to Vickers' side.  Vickers asked Dixon *why he was sitting so close.*  Dixon replied, *"I don't like sitting in front of a faggot."*

57.    At 9:00 PM, approximately 20 minutes later, Dixon picked up an FMC Employee-of-the-Month nomination form and said, *"Maybe I should nominate Chris (Vickers), because I enjoy watching him suck dick."*

58.   Still later that night, at 11:50 PM, Vickers and Dixon were watching a television

program in which an African American police officer was trying to get himself

killed on duty.  Vickers asked Dixon why the officer was trying to get himself

killed.  Dixon replied that the *"fucking queer nigger got caught with a dick in his

mouth."*

59.   Vickers approached Anderson privately and explained that he was complaining to

Anderson because he was very upset by the continued harassment.  Vickers asked

Anderson what he (Anderson) would do if he were ridiculed and mocked as

Vickers had frequently been by Dixon.  Anderson just laughed and said, *"Well,

that's Kory (Dixon)."*

60.   Between January 6 and January 15, 2003, the harassment intensified.  Two

officers, Ken Darst and Larry Mitchell, each spoke with Vickers regarding Dixon's

and Mueller's immature behavior.  Darst said that he understood Dixon had been

forced to resign from the Fairfield County Sheriff's Office because of his attitude

and immaturity.

61.   One evening during this time period Vickers asked Dixon, in front of Anderson,

why Dixon was harassing him.  Dixon replied, *"Because you're a faggot."*

62.   Vickers told Dixon, *"I've done nothing to you.  In fact, I liked you best out of all

the officers when I first got hired.  You've made jokes here and there, and to other

officers, taken pictures of me handcuffed, drugged my food . . ."*  At the mention of

drugged food Dixon began to laugh, and said, *"Ahh, I forgot about that.  I didn't drug your food, I sprayed anesthetic in your cup, so when you took a drink you would be affected.  It wasn't in your food."*

63.   Vickers asked Dixon why did his food smell if it wasn't drugged.  Anderson stated, *"I smelled it; it never smelled.  It was your pop that he sprayed."*

64.   On another night during this period Vickers witnessed Anderson address Dixon and Mueller in the FMCPD office.  Anderson was discussing the December 30, 2002, incident regarding the changing of the duty schedule and the note that was drawn with a face on it and a penis going into the face's mouth.  Dixon denied making the crude sexual drawing.  Vickers said to Mueller, *"Well, John, did you (do it)?"* Mueller admitted in front of Dixon and Anderson that he had been the one who drew the drawing on the note.

65.   On yet another night during this period Vickers again worked with Dixon, Mueller, and Anderson.  All four officers were in the FMCPD office, and Mueller began playing with a tape measure.  Mueller extended the tape so that it touched Dixon's crotch, and Dixon said, *"Oooohhhh Baby!"*  Vickers turned his attention away from Dixon and Mueller and began working on some papers.  Before Vickers knew it, Mueller had extended the tape measure out again and touched Vickers' crotch.

66.     Vickers became upset when Mueller touched his genital area with the tape measure, and said, *"Quit!"* Mueller continued to harass Vickers by trying to touch Vicker's genitals with the tape measure. Both Dixon and Mueller laughed at Vickers, and Mueller said, *"What's wrong, Kiss?"* Anderson said, *"Chris must be tired, he's not in the mood to play."*

67.     A few minutes later Vickers rose from his seat to check the duty schedule. While he was doing so, Dixon approached Vickers from behind and grabbed Vickers' breast. Dixon rubbed Vickers' breast and said, *"Look, Guys, Kiss has titties."* Vickers forcibly removed Dixon's hand from his chest, but Dixon continued to try to caress Vickers as if he (Dixon) were emulating homosexual behavior.

68.      On January 15, 2003, Vickers arrived for his shift at FMC and discovered a photocopy of the "anal sex" photo hanging on display in the FMCPD window where not only FMCPD officers, but other officers, staff, and visitors coming into the FMCPD could see it.

69.     On January 20, 2003, Vickers was on duty with Anderson and Mueller. At 6:20 PM Anderson addressed Vickers as *"Fruit Cake"* and continued addressing him as such several times. This upset Vickers very much and made him feel demeaned and unwanted.

70.     At 9:03 PM that same night Vickers noticed a female family member of an elderly burn victim crying in the FMC hallway outside the FMCPD. Vickers asked

Mueller why she was crying.  Mueller told Vickers that the woman *"needs a sympathy fuck."*  He then told Vickers, *"she wanted me to fuck her, but I told her 'no', that I was fucking you tonight."*  Vickers was very offended by the remark and by Mueller's lack of respect and empathy for the burn victim and her family.

71.  On January 22, 2003, Vickers was sitting in the FMCPD office with Dixon when Mueller walked into the room.  Dixon told Mueller, *"You better watch out, Chris might jump your ass.  He did me for no reason when I walked in."*  Dixon then proceeded to explain to Mueller that Vickers was in a bad mood.  Mueller said, *"Maybe he is having a heavy (menstrual) flow day, huh?"*  Mueller then said to Vickers, *"Why don't you pluck that tampon out and put a new pad in and lose some of that pressure?"*

72.  Mueller walked out of the office momentarily, returning with a sanitary napkin which he tried to rub in Vickers' face.  Vickers said, *"What are you putting a tampon on me for?"*  Mueller snapped, *"You fucker, it's a fucking pad,"* and continued to try to put the sanitary napkin in Vickers' face.  Mueller then began making sexual panting noises, followed by sexual grunts and moans.  Mueller finally settled for taping the sanitary napkin to Vickers' uniform coat.

73.  On January 25, 2003, Vickers and Mueller were on duty at FMC.  When Vickers first reported for duty at 6:00 PM, Mueller said to him, *"What's up, Kiss?  Are you in a better mood?"*

-29-

74.   Later that evening Mueller was talking to Anderson on the cellular phone, and both were apparently talking about Anderson's upcoming vasectomy surgery.  They were joking about getting a sex change operation.  Mueller handed Vickers the telephone so that Vickers could speak with Anderson.  Anderson said to Vickers, *"The doctor said he is willing to see you about your balls (testicles) dropping. He's willing to help you get your balls dropped."*

75.   Still later, at approximately 8:30 PM, Vickers, Mueller, and Officer Eric Brown were in the FMCPD office.  Mueller and Dixon began to converse over the department Nextel 2-way radiophone.  Dixon asked, *"Is that meeting of Chris's important?"*  Mueller answered, *"Yes."*  Then Dixon said, *"Well James would be pissed if Kiss missed his date."*  Vickers left the room without comment.

76.   On January 27, 2003, at approximately 6:15 PM, Anderson was returning to work after convalescing from his vasectomy surgery.  While Anderson was en route to FMCPD he engaged Dixon in conversation over the department Nextel 2-way radiophone.

77.   Dixon was sitting next to Vickers at the FMCPD office.  Anderson said to Dixon, *"Maybe I'll let Chris (Vickers) come in and see it (Anderson's penis)."*

78.   Dixon replied, *"Yeah, Chris (Vickers) will help you with it.  Chris (Vickers) will be happy to suck the poison out of it."*

79.   Anderson laughed and said, *"I'll bet he would."*

-30-

80.    On January 29, 2003, at approximately 6:30 PM, Vickers had finished his shift and was preparing to leave work to go to Columbus, Ohio.  He called his mother to speak with her.  During his telephone conversation Anderson came near Vickers and said loudly *"Are you going to James' house?"*  He also said, *"Hey Mom, I'm going to James' house."*

81.    Dixon joined in with Anderson, saying loudly and in a seductive voice, *"He's going to spend the night with James."*

82.    On February 2, 2003, at approximately 6:130PM, Vickers entered the FMCPD office after completing his security inspection rounds.  Anderson and Dixon were in the office, and Anderson said, *"Hey, there is a dildo sitting in the back of your truck."*

83.    Vickers went outside to inspect his truck and discovered that an electric toothbrush had fallen out of a duffle bag in the bed of his truck the night before.  He went back to the office and informed Anderson.

84.    Anderson said, *"Well, I thought it was a dildo.  I saw the rope and what I thought was a dildo, and I got concerned."*

85.    Dixon said, *"Well, I can see the rope and the dildo, but I don't see Chris (Vickers) tying any man up.  I do see a man tying Chris up, though."*  Both Anderson and Dixon laughed as they left the office.

86. On February 5, 2003, at approximately midnight, Vickers arrived for his shift at FMCPD. Anderson, Dixon, and Mueller were sitting in the office. Mueller said, *"Hey Chris, what's this I hear about you sucking dicks at the bath house?"* Vickers said, *"I don't know."*

87. Mueller said to Vickers, *"I haven't been sucked off in a long time. Do you wanna suck me off?"* Vickers said loudly, *"NO!"*

88. A little later, after Anderson and Dixon had left the office, Mueller said to Vickers, *"You know, Chris, it's okay to be gay. You can tell me, even if you're just bi[sexual]."* Mueller said this to Vickers in a mocking tone.

89. Still later on February 5, 2003, at approximately 1:00 AM, Vickers, Anderson, and Dixon went to the FMC cafeteria to get some food. As they entered the cafeteria Dixon noticed Harry, a FMC housekeeping employee. Dixon said, *"Hey, Harry, here's your man"* and pointed to Vickers.

90. Once Vickers, Anderson, and Dixon bought their food they all sat down at a table next to some of the FMC cleaning staff - including Harry. Dixon said to Harry, *"Ask Chris about the bath house."* Harry asked Vickers, *"What's this about the bath house?"* Vickers ignored Harry and Harry's question.

91. Upon returning to the FMCPD office from the cafeteria, Dixon asked Vickers if Vickers had learned to *"eat a girl out"* (perform cunnilingus), since Dixon had

demonstrated performing cunnilingus on a Barney[3] doll which had come into the FMCPD office only days prior.  Dixon said, *"Oh yeah, he (Vickers) just likes to suck dick."*

92.  Dixon continued to ridicule and harass Vickers.  He turned the doll over and simulated having anal sex with it, rubbing his crotch against it and saying, *"Oh yeah, oh yeah."*

93.  Dixon then said, *"I'll bet Kiss likes to fuck Barney too."*  Dixon approached Vickers and said, *"You want a piece of Barney too, huh"* and attempted to push the Barney doll into Vickers' crotch.  Vickers was able to deflect Dixon on the first attempt.  Dixon tried again to force the Barney doll into Vickers' crotch, succeeding on this second attempt.

94.  Vickers told Dixon to *"quit"*, but Dixon proceeded to shove the Barney doll into Vickers' crotch again.  Vickers pushed the doll away, and both Anderson and Dixon laughed.

95.  Later on the February 5, 2003, shift Vickers and Anderson were speaking.  Anderson said, *"Well, you only got eleven months left here"* (Speaking about Vickers' original plans to move to Florida in January of 2004).  Vickers replied, *"No, I think I'm going to retire here."*  Anderson responded, *"The hell you will."*

---

[3]A large, friendly purple dinosaur that is the primary character in an internationally known children's television show.

96.    Vickers asked Anderson, *"What, you won't let me work here 'til I retire?"*

97.    Anderson said, *"Now you're putting words in my mouth."*

98.    On February 10, 2003, at 7:30 PM, Vickers and Dixon were working the evening

shift at FMC.  Dixon was reading a report.  As he was doing so, he said aloud,

*"Hmmm, what does this say . . . [it says] 'Chris sucked another dick.'"*

99.    At 9:30 PM that night  Gary Garcia was called into the FMCPD to fix some office

cabinets.  While Garcia was immediately present Dixon grabbed a cigarette lighter,

placed it under his own genitals, and began to sing the Christmas carol lyric

*"Chestnuts roasting on an open fire . . . "*  He than said, *"Chris likes nuts*

*(indicating testicles), don't you Chris?"*

100.   A few minutes later, at 9:45 PM, Dixon approached Vickers and pointed to a lime

deposit that had rubbed off the FMCPD police cruiser onto the collar of Vickers'

uniform coat.  Dixon asked, *"What's on your coat?"*  He then proceeded to

demonstrate Vickers kneeling and said that the lime deposit on Vickers' coat was

*"cum"* (semen), not dirt.

101.   On February 12, 2003, at 6:55 PM. Vickers was on duty with Mueller and

Anderson.  Vickers and Anderson were already in the FMCPD office when

Mueller walked in.  Vickers asked Mueller if he had eaten yet.  When Mueller

responded that he had not, Vickers asked if Mueller wanted anything to eat.

Mueller replied, *"You want my dick."*

102.　Later the same evening Vickers commented to Mueller that he (Vickers) had made
several arrests - including some drug busts - in his career, and that he was not the
rookie that Mueller made him out to be. Mueller responded by contacting another
officer on his Nextel 2-way radiophone and asking that person if he was going to
see a "Chief Hunter" (Vickers' former police chief). Mueller asked the person to
make a note to ask Chief Hunter if Vickers had ever made any traffic stops or drug
arrests. He then asked the person to ask Chief Hunter if Vickers was gay.

103.　Vickers objected to Mueller's impromptu background check. Mueller just laughed
and ignored Vickers. Anderson commented sarcastically that, *"The next time I hire
someone I'll do the background check, because something really must have been
messed up when we hired Chris."*

104.　On February 13, 2003, at 6:25 PM, Vickers, Dixon, Mueller, and Anderson were
sitting in the FMCPD office in preparation for a departmental meeting. The pre-
meeting conversation turned to the topic of respect, and Vickers told Dixon and
Mueller that they needed to learn some respect and treat their fellow officers right.
Vickers informed Dixon that he did not appreciate all of the gay-oriented jokes and
negative comments Dixon had continuously been making, and that Dixon needed
to *"knock it off."*

105. Vickers further informed Dixon that he was sick of the harassment. He told Dixon that he (Vickers) had felt very out of place during their training with the LPD because of all of Dixon's gay-related jokes and negative comments.

106. Dixon replied, *"I don't talk behind your fucking back; I'll tell you right to your face that you're a fucking faggot."*

107. During the argument Anderson just sat back at his desk and covered his face with a piece if paper. At one point Anderson asked sarcastically, *"Do you need me to intervene?"*

108. After the meeting Vickers decided to leave the office. When he put on his uniform coat he felt a terrible burning and itching sensation. He immediately pulled his coat and asked the group, *"What's in my jacket?"*

109. Anderson asked Dixon in a sarcastic, mocking tone*, "Kory, did you put something in Chris's jacket?"* Dixon denied it, and Anderson repeated the charade with Mueller, with the same result.

110. Vickers left the office in disgust. Despite the extreme cold, the snow covering the ground, and the fact that he was wearing only a short-sleeved shirt for a top, Vickers walked the entire distance across the FMC campus and down the hill into the lower parking lot behind the Kroger's store to retrieve his truck. Vickers consulted with legal counsel, who advised him to get his coat tested at a lab. Lab

tests ultimately revealed that a chemical irritant had been placed in the sleeves of the coat.

111. On February 14, 2003, Vickers was driving his pickup truck in Lancaster, Ohio. While stopped at a red light Vickers was rear-ended by another vehicle. Dixon called Vickers at home that evening to ask what had happened. Vickers asked why Dixon called. Dixon replied, *"I didn't want my favorite bitch to get hurt."*

112. Three days later, on February 17, 2003, Anderson, Mueller and Vickers were on duty in the FMCPD office. The were talking about auto-body repair shops, and Vickers remarked that he had been driving his rental car since he was *"rammed in the ass."* Mueller laughed at Vickers and said, *"Hey, he got rammed in the ass, ha ha ha . . ."* Anderson then asked Vickers, *"Did you get rammed in the ass at the bath house?"* (insinuating Vickers had anal intercourse at a gay bath house.)

113. On February 21, 2003, Vickers arrived at FMCPD and discovered that his work schedule for February 23rd had been changed without his prior knowledge or consent. Vickers observed that he had originally been scheduled to work from 6:00 PM on the 23rd until 2:30 AM on the 24th. His next shift after that began at 4:00 PM on the 24th, giving Vickers thirteen and one-half (13½) hours between shifts. The new schedule had Vickers working his first shift from midnight on the 23rd to 8:30 AM on the 24th. His next shift remained unchanged, providing Vickers with a total of seven and one-half (7½) hours in which to travel home from his first

shift, get some sleep, shower and shave, get dressed, eat, and drive back to work for his next shift at 4:00 PM.

114. Vickers asked Anderson why his schedule had been changed. Anderson explained that Dixon could not find a babysitter for his daughter, so Anderson switched Vicker's schedule to meet Dixon's needs. Vickers states that it has been Anderson's policy and practice to always check with other officers before changing their work shifts to see if the proposed change would interfere with their schedules. Anderson's changing of the work schedules to accommodate Dixon's needs caused Vickers to get only three (3) hours of sleep between shifts on February 24, 2003.

115. On February 24, 2003, at 4:15 PM, Vickers was speaking with officer Ken Darst in the FMCPD office. Anderson called in on the Nextel radiotelephone and Vickers answered. Anderson asked where Darst was located, and Vickers indicated that Darst was also present. Anderson then said, *"Let me speak to him (Darst), I need to speak to a _real_ officer."*

116. When Anderson arrived to work later on February 24, 2003, Vickers showed him some graphic charts illustrating FMCPD statistical data Vickers had been working on. Vickers had spent several hours preparing the charts. Anderson took one look a the charts and then showed them to Dixon. Dixon said, *"It looks like a rainbow to me."* (Referring to the symbol of the Gay Pride movement encourages

acceptance of all forms of diversity.) Anderson then asked Vickers, *"Is this a rainbow?"*

117.  Later on February 24th, Dixon was standing behind Vickers, who was sitting. Anderson (who was sitting beside Vickers) told Dixon, *"Your fly is unzipped."* Dixon replied, *"Yeah, I got to zip it up."* Vickers turned around to see that Dixon was standing immediately behind Vickers, with his crotch oriented towards Vicker's head. Dixon was zipping up his pants while behaving as if it had something to do with Vickers sexually. Anderson laughed at this conduct.

118.  Later that night, at 8:50 PM, Vickers was preparing to leave the FMCPD office to shut off lights in the FMC at 9:00 PM as was required every night. Anderson and Dixon decided to go out for a drive. As Anderson was walking out of the office he stopped, bent down, picked up a gold box of chocolate candy and said to Vickers, *"Chris, did you get this for Kory (Dixon)?"*

119.  Vickers said, *"No."*

120.  Anderson said, *"Chris, do you want me to give this to Kory for you?"* and then he reached over to Dixon with the box of chocolates and said, *"Here, Kory, this is from Chris."* Both Anderson and Dixon laughed and walked out.

121.  Late in the shift Vickers filled out a request sheet to take some paid time off. He handed it to Anderson who said, *"Hand it to Captain Dixon."*

122. Vickers replied, *"I don't turn anything in to him, you're the Chief."*  Anderson took the request and handed it to Dixon saying, *"Here, Captain Dixon, what do you think?"*

123. Dixon took the request, looked at it, then <u>crumpled it into a ball and threw it into the trash</u>.  Anderson laughed and said, *"Oh well."*

124. On February 28, 2003, Vickers arrived at the FMCPD office to pick up his pay stub.  While he was there ne notices a recently-reigned employee's FMC identification badge with a post-it note attached to it.  At the end of the note it said: <u>And Chris, if you're interested, call me, but I know your plumbing is hooked up wrong.  Love Christina.</u>

125. On March 1, 2003, Vickers was cleaning the FMCPD office.  He called for a carpet cleaner to be brought in.  A few minutes later Harry T from FMC Housekeeping showed up and began vacuuming the carpet.  Harry T and Dixon began making anti-gay jokes.  While doing so Dixon approached Vickers and asked him *"What's this on your jacket - cum (semen)?"*  The substance was residue from Vickers' truck that had brushed onto Vickers' jacket.

126. On March 2, 2003, Vickers arrived at FMC and parked in a parking space which was previously designated for handicapped drivers but which was subsequently converted into a regular-use open space.  As soon as Vickers entered the FMCPD office he saw Dixon take the FMCPD camera and leave.  Dixon returned shortly

and began entering into the FMCPD computer a parking citation unlawfully made out to Vickers.

127. After entering the unlawful citation into the computer, Dixon printed both the citation and the photograph he had taken with the FMCPD camera, and put them in an envelope. He then took the envelope somewhere.

128. When Anderson entered the office Vickers told him of Dixon's attempt to cite him for illegal parking in a space that was no longer handicapped designated. Anderson said, *"I know, I told him that."*

129. At 8:10 PM on March 2, 2003, Vickers was in the FMCPD office with Anderson and Dixon when the Somerset Squad brought a patient to the FMC emergency room. One of the Somerset Squad members was a young, well-dressed man with blonde hair, who was somewhat flamboyant in his mannerisms. Dixon saw the man and said, *"Hey, he's a fag."*

130. Anderson stood up and asked, *"Who's a fag?"* Dixon pointed to the young man and said, *"That guy."* Dixon then pointed the man out to Vickers and said, *"Chris, look."*

131. A few minutes later Dixon went outside the office for a better look, then came back in and said, *"Yup, he's a fag."*

132. Vickers finally got up and went to the window to see what Dixon was making such a big deal over. When he did so, Anderson said, *"Okay, here is the official word*

*on if the guy is queer,"* insinuating that Vickers was gay and would therefore be able to determine if the young man was or was not gay as well.

133.   Later on the March 2, 2003 shift Dixon was on the telephone speaking to someone female, and he asked her if they were working her hard.  He said, *"Yeah, I'm working hard - Chris is under the desk."* Dixon laughed, and then said, *"Chris is working hard.  He's under the desk sucking me off."*

134.   On March 9, 2003, Vickers had traded shifts with Ken Darst and was therefore working the third shift.  Mueller asked Vickers why Vickers traded shifts with Darst.  Vickers replied that he traded with Darst because Darst had asked him to. Mueller then said, *"Well, you can either switch shifts with Kory (Dixon) tomorrow night or he'll call off.  Either way, you're working third shift tomorrow night."*

135.   Vickers explained that he couldn't work the third shift the following night because he had to drop off his truck at the repair shop.  A few minutes later Mueller informed Dixon that Vickers said he was busy the following night.  Dixon said, *"Go ahead and switch the schedule."*  Mueller switched the schedule and then said to Vickers, *"there you go, you're working third shift,"* and laughed.  Dixon called in at 4:30 AM and asked Vickers if he had gotten the schedule changed.  Vickers informed Dixon that he had done so, and Dixon said, *"Okay."*

136.   The next night/morning, March 10, 2003, when Vickers reported for the third shift at midnight, he discovered Dixon had also reported for duty.  Vickers was very

upset at this because he had to make significant adjustments to his personal daily affairs and schedule in order to accommodate Dixon's forced schedule change the night before. Vickers asked Dixon, *"What are you doing here?"*

137. Dixon replied, *"I'm working . . . I didn't need to take the night off."*

138. Vickers said to Dixon, *"Well, why didn't you call me and tell me that you were going to work, so I could have come in on my regular shift?"*

139. Dixon said, *"Well, why don't you call off (from work)? Go home."*

140. Vickers said, *"No, this is not right. I had to have my dad drive me to work, and I had to rearrange my schedule so that you could take the night off, and here you go and work anyway. That's just not right."*

141. Dixon just turned his head away from Vickers and ignored him.

142. Vickers turned to Anderson and said, *"Steve, that's just not right."*

143. Anderson replied, *"I didn't approve any time off."*

144. Vickers said, *"Well, this is wrong. I don't think this is right. What are you going to do about it?"*

145. Anderson became angry and said, *"Hey now, you just calm down. You're getting out of line. You just settle down."*

146. Vickers replied, *"I'm not trying to get out of line. I just feel that I have been wronged."*

147.  Anderson proceeded to change the subject, redirecting Vickers' attention to some tasks Vickers needed to complete, and otherwise ignoring everything Vickers had just said.

148.  A few minutes later, at 12:20 AM, Anderson said, *"Well, I'm out of here,"* and proceeded to leave.  Vickers said he would walk Anderson to his car.

149.  On the way to Anderson's car Vickers attempted to speak to him about the way Vickers had been treated by Dixon, but Anderson refused to engage Vickers in conversation or even to look at him.  Instead, Anderson kept walking away from Vickers and toward his own car.  As the two neared Anderson's vehicle Vickers said, *"I'm sorry if you think I got out of line, but I am upset, and I don't think this is right."*  Vickers then asked, *"How would you feel?"*

150.  Anderson said, *"What do you want me to do - write him up?"*  Vickers replied, *"You do what you need to do.  I'll write a report or a statement or whatever you need.  Just let me know, and I'll make it so."*

151.  Anderson said, *"Well, there's gonna be some changes to the schedules around here; things aren't getting done."*

152.  Vickers asked, *"What does that mean?"*  Anderson would only say, *"That's all I'm going to say for now,"* and he drove off in his vehicle.

153.  At 4:00 PM that same day - March 10, 2003 - Vickers returned for his second shift of the day.  He had only gotten off work from his prior shift at 8:30 AM.  Vickers

-44-

spoke with Ken Darst, who informed Vickers that Anderson had told him that

Vickers had been the one inciting things at FMCPD the night before, and that

Vickers was the one who had been in the wrong.

154. Later in the shift Dixon spent some time cleaning and adjusting the FMCPD's in-

house video surveillance equipment, after which he left the camera pointed in at

the FMCPD office rather than out at the lobby, where it had previously been

aimed. Video monitoring and taping of FMCPD officers was a violation of FMC

policy. Vickers also noticed that the camera was set in a locked mode which

prevented it from being turned off.

155. On March 12, 2003, Vickers reported for work and discovered that the video

surveillance camera was still videotaping FMC officers rather than the lobby area.

He informed officer Larry Mitchell about the videotaping, of which Mitchell was

previously unaware. The two of them turned the camera off and turned it around.

The viewed the videotape and discovered that the department's officers had been

recorded for the past 24 hours.

156. Later that evening Anderson spoke with Vickers over the phone regarding the

situation between Vickers and Dixon. Anderson said, *"You two are going to have

to get along. Your disagreements are disruptive."*

157. Vickers replied, *"Well, Steve, I've bent over backwards for Kory (Dixon). I have

went the [extra] mile for him. Every time he needs a day off or to switch*

-45-

*[schedules], I switch, and I do it for all of the other [officers].  But when I can't switch, Kory manipulates it so that I have to work and he gets to do what he wants to do anyway."*

158.  Anderson said, *"Well, I think you both know what the problem is, and what you need to do to fix it."*  Vickers asked, *"Well, how can I be the problem?  I've done everything I could to get along.  Kory and John [Mueller] make these gay jokes, and they are not just jokes; they are extremely disgusting in nature."*

159.  Anderson said, *"How do you think we can resolve this?"*  Vickers said, *"Well, Steve, I really don't know."*

160.  Vickers related the entire conversation to officer Larry Mitchell later in the day. He asked Mitchell what he thought could be done to fix the problem.  Mitchell said, *"I don't know.  I think Kory [Dixon] made up his mind when you [Vickers] stated that he doesn't like you, and that's how it's going to be."*

161.  Vickers pointed out all that he had done to cooperate with his fellow officers. Mitchell said, *"Yes, I know.  But still, Kory doesn't like you."*

162.  A little while later Anderson called Vickers on his Nextel radiotelephone. Anderson asked, *"Is this Kiss?"*  Vickers replied, *"This is Chris."*  The two discussed Vicker's "QI" reports.

163.  At 4:00 PM that day Mueller arrived in civilian clothing.  Vickers and Mitchell asked Mueller why he came to work in plain clothes.  Mueller pointed to a picture

that FMCPD had of an African American male stealing from Berger Hospital, and said, *"I'm here for the nigger."*

164. On March 13, 2003, Vickers and Dixon were in the FMCPD office when the phone rang. Dixon answered it and said, *"He's here."* Dixon then put the phone on hold and said, *"He's sucking dick."* He turned to Vickers and said, *"It's for you."* Vickers took the call and discovered that it was his mother on the telephone.

165. Beginning on or about March 16, 2003, Mueller began ignoring Vickers and refusing to speak to him except as necessary - either to perform official duties or in service of Dixon. At the beginning of Vickers' shift on that date Mueller stopped into the FMCPD office to pick up a power pack for his cell phone. Vickers greeted Mueller, saying, *"What's up?"* Mueller pointedly ignored Vickers ans would not talk to him.

166. On the next day, March 17, 2003, Vickers was preparing to leave at the end of his 10:00 AM-to-6:30 PM shift when Mueller came in. Vickers again greeted Mueller, saying, *"Hey, what's up?"* Mueller again pointedly ignored Vickers and walked right past him without speaking or answering.

167. On March 22, 2003, Vickers reported for duty and again said to Mueller, *"Hi. what's up?"* Mueller again would not respond and did not say anything to Vickers. Later, however, while Vickers was out on patrol, Mueller contacted him on their Nextel radiotelephone. Mueller said, *"Kory (Dixon) wants to know if you'll switch*

-47-

*[shifts] with him.*" Vickers said, "*No, I can't.*" Mueller said, "*Okay.*" Later, however, Mueller again contacted Vickers and told him, "*Kory took the night off tomorrow night.*" With that, Vickers prepared to work a midnight shift on March 23, 2003.

168. At approximately the same time that Mueller stopped speaking to Vickers, Anderson began finding fault with Vickers performance. Anderson faulted Vickers for actions Vickers undertook pursuant to proper police procedure and to FMC's benefit.

169. For example, On March 18, 2003, Vickers was called to the FMC day care facility in response to a report of a vicious dog threatening children there. Upon arrival Vickers and officer Rich Storts observed an aggressive dog, barking and lunging in the direction of the children. The officers put the children in their police cruiser for safety and then sprayed the dog with chemical agent/mace. The dog stopped its aggressive behavior and rolled around on the ground and wipe its eyes. After about 10 minutes the dog had recovered.

170. Later the same day Anderson called Vickers and instructed him to "*have something in writing*" regarding the dog incident, claiming that a woman had filed a complaint in FMC's Human Resources department. Vickers wrote a report and obtained witness statements. He then called Anderson and said, "*Okay, I've got the report done and witness statements from two people. The dog warden is also*

*willing to fill one out, and I can get at least two more [witness statements] if needed."*

171. Anderson then said, *"Why are you getting witness statements? Howard (Sniderman) does not like that because it draws too many people into the situation, and just draws attention."* Vickers did not understand why obtaining witness statements was a problem, since it is standard police procedure to get witness statements in any given situation.

172. Vickers also did not understand Anderson's concern in light of the fact that Anderson himself had required *"something in writing,"* which would ordinarily mean a police report, and police reports are ordinarily accompanied by witness statements.

173. Anderson also found fault with Vicker's handling of another exigent circumstance on the same day. On March 18, 2003, Vickers became aware that someone suspected of being an *"office creeper"*[4] had entered into FMC. Vickers decided the best course of action would be to notify the entire staff discreetly. He contacted FMC's Vice President - Chief Financial Officer, Sky Gettys, explained the situation. He asked if he could have the FMC operator send a message over FMC's computer network to all of the staff computer terminals, warning staff that the suspect may be in the building and to be on the lookout for him. Sky Gettys

---

[4] Someone who goes through offices and steals purses, credit cards, etc.

indicated that he thought Vickers had a good idea, and he gave Vickers the approval to implement the plan. Everything worked well, and the staff were notified quickly.

174. On Vickers' return to work March 21, 2003, Anderson lashed out at Vickers for his having gone to Sky Gettys for permission to notify the staff of the suspected presence of an office creeper. Anderson stated that Howard Sniderman said Vickers had broken the chain of command. Anderson further told Vickers that Howard Sniderman instructed Anderson to inform Vickers that Vickers has a manager, and to go through the chain of command, and to stay out of administration.

175. When Vickers entered the FMCPD office on March 21, 2003, he noticed Dixon's name tag sitting on the office window sill in full view of anyone present. The name tag had been altered with words, letters, and heart-shaped symbols placed both before and after Dixon's name. As altered, it read <u>"I   U FROM DIXON    U Chris"</u>.

176. Darst came into the FMCPD office at 4:00 PM. He and Vickers spoke later on after Vickers returned from the LPD. Darst then related to Vickers a conversation Darst had had with Anderson. Anderson told Darst that on a previous night Vickers had called the FMCPD and Anderson used the Criss-Cross directory [5] to

---

[5] A method of linking telephone numbers with their associated addresses.

locate the address of the number from which Vickers had called. Anderson told Darst that he had determined Vickers was staying at another man's house, implying to Darst that Vickers was doing so in furtherance of a homosexual relationship.

177. Several days previous to Anderson's conversation with Darst, Anderson had asked Vickers in the FMCPD office where Vickers was staying. As if to answer his own question, Anderson took a saucer, turned it over, rubbed it as if he were rubbing a crystal ball, and turned it back over to show an address of 140 E. Lincoln Avenue in Columbus. Also on the saucer was written the name "Eric" - yet another innuendo that Vickers was engaged in a homosexual relationship and homosexual behavior.

178. Later on the night of March 21, 2003, Darst related to Vickers that he had recently been present at an informal meeting between Anderson and two FMC managers or employees, a Mr. Lavek and a Mr. Stump. Darst told Vickers that he witnessed Anderson making jokes and disparaging comments about Vickers - including allegations that Vickers was homosexual. One of the men had an apparent injury to his chin. Anderson said to the man, *"Oh, Chris would comfort you. He would care for that chin of yours."* Darst said that the tone and inflection of Anderson's voice made the comments very demeaning and degrading toward Vickers.

179. Darst showed Vickers a logbook page entered by Dixon. The log sheet had the word "FAG" written on it. Darst told Vickers, *"I'll bet you they are trying to cover*

*their tracks"* (by making a defamatory entry on one of Dixon's logs so as to cast Dixon as a victim as well as Vickers).

180. Darst and Vickers continued their conversation, discussing unusual going-on in the FMCPD of late. Both were concerned that *"something was up"* in the FMCPD - especially with regard to the videotaping of the FMCPD office.

181. In the course of their conversation Darst informed Vickers of a similar incident in which Dixon harassed an employee he suspected of being homosexual. Darst understood that Dixon had made several gay-related comments about an emergency room technician named Ray Fiore. Darst also understood that Fiore complained to his manager about Dixon's harassment.

182. Vickers recalled some of the incident, which occurred just as he was starting his work with FMC in November of 2001. Vickers observed Dixon going around the FMCPD office calling Fiore a *"faggot"* and a *"cocksucker"*, and threatening to sue him. Vickers spoke to Anderson about Dixon's behavior, and Anderson informed Vickers that he had told Dixon not to sue because FMC frowned upon any lawsuits. Vickers resolved to speak with Fiore the next day.

183. On March 22, 2003, Vickers had an opportunity to speak with Fiore. Fiore told Vickers that between October of 2001 and January of 2002 he was sitting in the triage section of FMC when Dixon came in, sat in Fiore's lap, and said, *"Oh baby! Give it to me baby,"* and rubbed himself against Fiore. Dixon's behavior upset

Fiore very much, but he initially did not say anything.  Once Fiore began to hear

Dixon joke and make negative remarks about him - such as calling him *"gay Ray"*,

he went to Dixon's manager, Steve Anderson, and reported it.  Fiore told Anderson

that he wanted Dixon's harassment stopped or he would go to his lawyer.

Anderson replied, *"Don't worry about it.  I'll take care of it right away."*  Either

nothing was ever done about Dixon's behavior, or Dixon simply ignored any

warnings he may have received.  Fiore retained attorney Curt Griffith from New

Lexington, Ohio, to represent him and assist him in stopping the harassment.

184.  Griffith contacted FMC Human Resources and also Sue Cook, Fiore's manager,

and made sure that something was done to correct the situation.

185.  On March 24, 2003, Vickers opened his metal clipboard to get one of his

offense/incident reports.  He discovered that someone had once again impressed

the word "FAG" on all of his two-part, pressure-sensitive offense/incident reports

so that the top copy appeared unaltered, but the second page had the epithet boldly

emblazoned on it.

186.  Vickers also noticed that, in the phone log under Darst's name, someone had

written "Chris + Ken (Darst)" on the page.  Vickers perceived that Darst was

beginning to draw some harassment as well because he had befriended Vickers.

187.  On March 26, 2003, Vickers addressed with Anderson his concerns about being

videotaped in the FMCPD office.  Anderson said, *"What?  You don't like being*

-53-

*videotaped?"* Vickers replied, *"Well, I thought we [police officers] were the most trusted people here."* Anderson replied to the effect that videotaping was being used as a quality-improvement tool. Anderson also stated that he had informed Howard Sniderman about the videotaping and Vickers' reaction to it, and that Sniderman just laughed when he was told about it.

188. On March 27, 2003, Vickers spoke with Anderson about Dixon's and Mueller's homosexually-based harassment. He informed Anderson about the <u>"I ♥ U FROM DIXON ♥ U Chris"</u> name badge and the word "FAG" being written on his report forms. Anderson advised Vickers that Vickers *"had to learn to get along."* Anderson also told Vickers that he had spoken with a Lancaster police officer who advised that Vickers would not make it through roll call in the LPD. Apparently the Lancaster police officers choose an officer each night to tease severely.

189. Vickers told Anderson, *"I can't see how you get along when they make gay jokes and other stuff all the time."* Anderson replied, *"Well, don't you think Kory (Dixon) and John (Mueller) do that stuff to each other all the time?"*

190. Vickers answered, *"Yes, but there is a difference between joking and being gross."* Anderson said, *"Well, you're just going to have to deal with it."* He then proceeded to tell Vickers that when Dixon and Mueller see Vickers get upset, it only encourages them to harass him more.

191. In early April of 2003 Vickers engaged the services of the undersigned legal counsel, Attorney Thomas Watkins (hereinafter "Watkins"), to assist him in ending the sexual harassment he was continuing to receive at FMC.

192. Watkins met with FMC representatives on a Friday in mid-April, 2003. During the meeting the representatives assured Watkins that FMC would immediately begin looking into Vicker's complaints and allegations of sexual harassment. They further assured Watkins that FMC would <u>not</u> tolerate any retaliation against Vickers for his having engaged counsel and the brought forth his allegations. At the conclusion of their meeting Watkins briefed Vickers on the results of the meeting, including FMC's assurances that FMC would not permit any further harassment to occur.

193. Vickers reported to work the next day and learned that Anderson, Dixon, and Mueller had not reported for work as originally scheduled. Vickers also learned from Darst that Anderson had called Darst, saying " I need to speak to you NOW!" - and that Anderson had also been trying desperately to contact of Mitchell.

194. Vickers observed that the video surveillance camera in the office had been removed and dismantled, as was the citizens band ("CB") radio soon thereafter.

195. Vickers learned that FMC's attorney had begun to call in witnesses, and were speaking to the other officers.

196.   Upon information and belief, Vickers understands that FMC's investigation into
       the matter was incomplete as measured by usual and customary investigatory
       standards, as only Anderson, Dixon, and Mueller were interviewed in any depth.

197.   Upon information and belief, Vickers understands that Mitchell's interview was
       cursory, perfunctory, and topical.

198.   Additionally, Vickers understands that FMC also interrogated Darst after he had
       worked a midnight shift, and had little sleep, and literally grilled him over what he
       had written in an affidavit in support of Vickers' claims.

199.   Upon information and belief, Vickers understands that FMC did not interview all
       of the FMCPD officers, and that FMC terminated the investigation after speaking
       with only two of the witnesses Vickers identified as corroborating his version of
       events.

200.   At the conclusion of its "investigation" FMC's counsel sent Watkins a letter stating
       that, even though many of the events described by Vickers may have occurred,
       FMC did not think Vickers had any legally actionable claim against FMC.

201.   On either the Monday or the Tuesday following the meeting between Watkins and
       FMC, Vickers was called to FMC's Human Resources department for the 1st time
       since he had been employed at FMC.  There Vickers met with Eric Brandt, who
       advised Vickers that FMC had concluded their investigation and, as a result,
       Anderson, Dixon, and Mueller had been suspended for a period of time.  Brandt

explained to Vickers that the suspensions would have to be served at various times, however, due to the requirements of the FMCPD shift schedules.

202.  Brandt also advised Vickers that their investigation had revealed some sort of alleged actionable misconduct by Vickers, but that FMC had decided not to suspend Vickers in light of the harassment he had already endured.

203.  At that point Vickers asked Brandt to state specifically what misconduct Vickers was alleged to have committed which would have warranted disciplinary action. Brandt was unable to give Vickers an answer, except to say, *"well, this is just what the investigation revealed."*

204.  Vickers said he and Watkins had discussed the matter and were planning to initiate civil legal proceedings against FMC.

205.  Brandt stated that he was going to see about rearranging Vickers' schedule so as to minimize Vickers' contact with the offenders, Anderson, Dixon, and Mueller. Vickers asked Brandt to be moved to 3rd shift because on 3rd shift Vickers would have a maximum of 2 hrs contact with the offenders, and that from his prior experiences working on 3rd shift he would probably be working alone for most of the shifts.

206.  Brandt told Vickers that he would speak with Sniderman about the possibility of Vickers working 3rd shift, and that he would get back to Vickers with an answer by the end of his shift that night.

207.  Brandt failed to give Vickers any feedback on the matter that night - or at any time thereafter.

208.  After leaving the meeting with Brandt, Vickers proceeded back to the FMCPD office.  Upon entering, Vickers discovered Anderson sitting inside, wearing his police uniform.  Vickers was both startled and somewhat offended, because he had understood that Anderson would be off for a few days.  Less than an hour had elapsed since Brandt had informed Vickers that the three harassers - including Anderson - were going to be suspended for their misconduct.  Vickers felt as though he had been lied to or otherwise mislead by Brandt, and that FMC was not dealing with him honestly or in good faith.

209.  Vickers was forced to work under the direct supervision of the senior-most of his harassers for the entire shift - approximately 5-6 hours.  At one point during the shift Anderson stuck out his hand, and said to Vickers, "what do ya say, lets shake on it and put this behind us."  Vickers shook his hand in order to keep the peace and to avoid providing Anderson with a pretext to cause more problems.  However, Anderson never apologized to Vickers.

210.  Over the next few days, the suspended officers Anderson, Dixon, and Mueller, began to return to work.  Once they had returned, Vickers, Darst, and Mitchell all noticed that Anderson was being overly friendly to the three of them (Vickers, Darst, and Mitchell) but was keeping them under intense and constant scrutiny.

-58-

Dixon and Mueller would both sit in the FMCPD office, and just stare at Vickers and Darst and would not talk to them at all. Mueller especially would stare and glare at Vickers for extended periods, giving very hostile and threatening looks. Both Darst and Mitchell noticed this. At one point Mitchell even commented that, *"you could cut the tension in here with a pair of bolt cutters."*

211. Vickers noticed that, as he patrolled the FMC grounds, Dixon and Mueller would continually scrutinize and monitor his movements and action. Darst also noted this behavior, and he and Vickers discussed it with one another often. They both began to feel oppressed and threatened - even paranoid - under Dixon's and Mueller's continuous glares and the stares.

212. During Vickers' discussion with Brandt at FMC's Human Resources department, Brandt cautioned Vickers against speaking to anyone else about his allegations of sexual harassment and the subsequent investigation and disciplinary measures. Brandt told Vickers that if Vickers spoke about the case to anyone he would face severe disciplinary action or even termination. Brandt also informed Vickers that Anderson, Dixon, and Mueller had been instructed likewise.

213. Mitchell was the first to hear that Anderson, Dixon, and Mueller were talking about the incident with others in violation of Brandt's "gag order". Mitchell informed Vickers that Laura Graf - a nurse at FMC - had approached Mitchell apparently mistaking him for Mueller. Graf stated to Mitchell *"Its okay, John.*

-59-

*Steve told me all about what's going on.  Don't worry, he'll take care of everything."*  Laura Graf is not only a nurse at FMC; she is also Anderson's mother-in-law.

214.  Vickers, Darst, and Mitchell soon began to hear rumors about the incident throughout FMC, and people were talking about it.

215.  The breach of FMC's gag order (requiring that all involved maintain confidentiality and prohibiting any disclosure) exceeded the bounds of FMC's campus as well.  Darst was warned by a Lancaster police officer, that the officer had been approached by Lancaster Police Officer Will Tolley, who asked the officer what was the story about Vickers and Darst suing FMC for sexual harassment.

216.  In the conversation Tolley told the officer that "No one fucks with Steve Anderson and gets away with it."  Tolley also told the officer that Vickers and Darst would "get fucked" and that he (Tolley) would "fuck them".

217.  Tolley's threat was very intimidating to Vickers, since Tolley is a very large man - over six feet tall and weighing about 250-280 lbs.  Tolley told the officer that a "good friend" had told him about the matter.  Anderson is known to be a "good friend" of Tolley - even going so far as to assist Tolley in getting hired by the LPD. Vickers understands that Tolley had a bad credit history at the time Tolley was making application for employment with the LPD, and that bad credit was a

disqualifying factor for employment purposes.  Vickers further understands that Anderson intervened on Tolley's behalf and helped him get past the disqualifying credit history to be hired by the LPD.

218. Both Vickers and Darst were increasingly intimidated, both by the constant and widespread animosity of some of their fellow officers, and by FMC's apparent indifference.  Both began to fear for their jobs and their safety.

219. On April 28, 2003, LPD Officer Adam Swope entered the FMCPD office and asked Darst what was *"what's going on with your buddy, Chris Vickers."*  Swope said he had heard that Vickers was suing FMC, and then he proceeded to make a limp-wrist gesture, implying Vickers was an effeminate homosexual.

220. At this point Darst went to see Brandt for - the second time - and complained.

221. Vickers also went to see Brandt and complained.

222. Brandt reassured Vickers that he would look into the events and take the appropriate action.  Dominic Prunte, Vice President of Human Resources was also present and made the same statement giving the same reassurances.  Both promised Vickers that they would get back to him by the 1st of the week.

223. During the time that these events were taking place, Darst approached Vickers and pointed something out to him. Darst took Vickers into the FMCPD office and showed him a pink and white colored birthday card.  The card was posted up on Anderson's desk, out in the open, and displayed so everyone could see it.  The card

was from Dominick Prunte (VP of Human Resources). The card was warmly written and wished Anderson a "Very Happy Birthday."

224. Vickers and Darst considered the card from Prunte to be especially inappropriate considering that Prunte, as Vice President of Human Resources, had become involved in Vickers' discrimination complaint. They understood Prunte's actions in sending the card to Anderson showed not only favoritism, but clearly demonstrated that Prunte was on Anderson's "side" of the issue, since Prunte did not send birthday cards to any of the other FMCPD officers.

225. Darst and Vickers also perceived Anderson's accentuated display of the card as Anderson's flouting of the situation to Vickers - a means of demonstrating that FMC Administration still favored him despite the discrimination against Vickers which he either permitted or aided and abetted. Moreover, neither Darst nor Vickers had ever seen Anderson display something like a greeting card before. Instead Anderson would usually just throw them in the trash, or at the least lay them in a pile somewhere on his desk, where they would eventually be misplaced or lost.

226. During the same approximate time frame that Anderson was displaying the birthday card Prunte had given him, Darst happened to observe Lisa Stevens and Mueller in conversation at FMC. As he drew nearer to them they became aware of his approach, and they abruptly and hurriedly ended their conversation and

separated.  Mueller went back in to the office, and Stevens went away.  In light of Darst's training, knowledge, and experience in law enforcement he considered  the incident as suspicious due to their furtive actions and conduct. (On information and belief, Vickers understands that Stevens had previously assisted Anderson in getting another officer - a Jimmy Morrison - fired from his job at FMC.)

227.  During this same time period rumors about the incident continued to spread and multiply.  One morning, as Vickers was reporting to work one morning, he was walking across the lower parking lot when Howard Sniderman approached him. Sniderman asked Vickers how he was doing.  Vickers told Sniderman that he was upset because Anderson, Dixon, and Mueller were apparently discussing the matter despite the gag order placed on all involved.  Vickers stated further that he was going to have his attorney contact FMC about the situation.

228.  Vickers and Sniderman then went their separate ways.  Later that day, however, Vickers again encountered Sniderman on the premises - this time in the hallway near Radiology.  Vickers spoke with Sniderman and told him that he hadn't meant to come across harshly in their earlier conversation.  He explained to Sniderman that the other parties were obviously talking to others about the case, and that both he (Vickers) and Darst were hearing about it.  He reminded Sniderman that all involved in the matter had previously been instructed that if any of them spoke about the case, that person would be disciplined severely or even terminated.

229. Vickers advised Sniderman that he wasn't happy about having to get a lawyer involved on his behalf, and that anyone who thought otherwise was mistaken. Sniderman replied somewhat indirectly that he did not believe Vickers' allegations, and insinuated that Vickers was lying. They then parted company and Vickers departed.

230. During the same week Vickers and Darst continued to feel extreme pressure at work due to the constant oversight and scrutiny given them by Anderson, Dixon, and Mueller. Dixon and Mueller were the most extreme in their behavior, which went beyond watching every move made by Vickers and Darst and included glaring and staring at them in an intimidating fashion.

231. One night during the week Anderson and Vickers were both sitting in the FMCPD office when Anderson abruptly said to Vickers, *"Your request to transfer to another shift has been denied. I spoke to Kory (Dixon), and I spoke to Rich (Storts), and Rich and Kory did not want to change shifts, so your request to move to another shift has been denied."* Anderson grinned when he informed Vickers of this.

232. Vickers was upset and very agitated at this news. He felt very isolated. Vickers was not just upset that he had been denied the right to switch to another shift, but even more so by the fact that FMC Human Resources had obviously turned the

matter over to Anderson - one of Vickers' primary tormentors and offenders - to handle as he deemed appropriate.

233. On Friday of the same week, in the afternoon, Vickers was sitting in the cafeteria with Darst during a lunch break. He received a Nextel call from Anderson, who asked Vickers to call him back on a regular telephone line. When Vickers called Anderson as requested, Anderson informed Vickers that he was to be in FMC's Human Resources department on the following Monday. Vickers asked Anderson what the meeting was about, and Anderson stated that he had no idea.

234. Later that day Darst approached Vickers. Darst advised Vickers that he (Darst) had spoken to a confidential source in FMC Administration who understood that the reason HR was having a meeting with Vickers was to initiate a negative personnel action against him in order to discredit him in the event that he actually filed a lawsuit against FMC. The source understood that, by doing so, FMC hoped to be able to portray Vickers as merely a disgruntled employee to the news media should any of them report on the matter.

235. Later that (Friday) evening Vickers attempted to call Prunte at home to confirm whether or not the meeting on Monday was a disciplinary meeting. Vickers left a message on Prunte's voice mail machine asking Prunte to call him back. Prunte never returned the call.

-65-

236. On Saturday morning Vickers called into Human Resources and spoke to Eric Brandt.  Vickers asked Brandt whether the meeting scheduled for Monday  was a disciplinary meeting.  Brandt would not discuss the matter with Vickers, and would only say that they would discuss it Monday.  Vickers advised Brandt that he needed to know whether or not it was a disciplinary meeting, because if it was he wanted to have counsel present.

237. Brandt confirmed that the meeting was a disciplinary meeting, but informed Vickers that *"[w]e do not allow attorneys or counsel present during these meetings."*  Brandt further advised Vickers it was a disciplinary meeting in reference to an unrelated matter, after which Brandt ended the call quickly.

238. Vickers called Watkins to discuss the matter, after which he decided to resign from his position with FMC rather than permit FMC to *"railroad"* him on pretextual grounds.

239. On Monday morning Vickers reported to work, well dressed in slacks and a dress shirt.  Vickers went to Mina Ubbing's office and handed her his resignation.  There was virtually no discussion.  Ubbing looked at it and said, "Okay" and then asked Vickers if he had given a copy to HR.  Vickers replied that he was headed down to HR at that time.  Ubbing said, "Okay" and Vickers left.  Ubbing appeared not to care about Vickers' resignation, and seemed relieved about it.

240. Vickers the went to HR, where he was met by Prunte, Brandt, and Anderson.  They all asked Vickers to walk in a room with them.  Vickers entered the room and advised the three that he would not be attending the meeting.  Vickers then handed Prunte his resignation and walked out.

241. Darst was standing by awaiting Vickers return when he encountered Lisa Stevens. Stevens was not scheduled to be on duty then, and she was acting very strange, nervous, and suspicious.  She made an excuse to the effect that she either forgot something or was in to check on something, and that was the reason that she was there at the hospital on unscheduled time.

242. Vickers understands upon information and belief that many or all of the hospital managerial staff were instructed by Cynthia Pearsall via email that they should watch the newspapers for any coverage of the matter but not to say anything to anyone.

243. The confidential source in FMC Administration later reported that Prunte had walked into a managers  meeting and was asked by a manager how the disciplinary meeting with Vickers went, at which point Prunte began to brag, saying, *"It only took 2 minutes and he quit"* -  almost laughing about it.

244. Vickers later learned from an FMC nurse that Lisa Stevens had something to do with either the disciplinary meeting or the pretext upon which it was based. Vickers understands that it was an alleged complaint by Stevens that FMC was

intending to address at the disciplinary meeting. The FMC nurse asked Stevens about it, and Stevens told her that she (Stevens) was there for Vickers' disciplinary meeting, but that she could not discuss it because it was a "legal matter."

245. Vickers understands upon information and belief that during Dixon's and Mueller's suspensions each was actually working elsewhere for FMC, doing mental transports for FMC and for the Fairfield County Sheriffs Office, to help supplement their incomes. Vickers also understands that Dixon and Mueller were the only ones who were given the opportunity to do the transports for extra money.

246. When Vickers left FMC he was averaging $14.00 - 16.00 per hr. When he left FMC he took a $ 7.50 per hour pay cut.

247. On June 19, 2003, Vickers filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission in Cleveland, Ohio.

248. On July 8, 2003, the Cleveland EEOC issued Vickers a Notice of Right to Sue. (See Exhibit 1)

249. On July 9, 2003, Vickers received the Notice of Right to Sue from the Cleveland EEOC Office.

## CONFLICT OF LAWS AND/OR AUTHORITIES

250. Vickers does not make any claim of protected status on the basis of homosexuality *per se* - whether real or perceived - with regard to his Title VII claim.  Vickers s claim is instead grounded in the body of sex-discrimination jurisprudence set forth by the landmark U.S. Supreme Court decision *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and its progeny.   Although Title VII does not prohibit discrimination against homosexuals *per se* - whether real or perceived - the *Price Waterhouse* line of cases stands for the proposition, *inter alia*, that it is improper to discriminate in employment on the basis of real or perceived nonconformity with gender norms.

251. Holding that decisions based on sex-typical behavior constitute impermissible sex discrimination, the Court affirmed that  we are beyond the day  when employers may insist that employees  match the stereotype associated with their group [because]  in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.   *Id.*, at 251 citing *Los Angeles Dept. of Water v. Manhart*, 435 U.S. 702, 707 (1978).

252. Vickers argues herein that his Title VII-based theories of recovery are reasonable and supportable within the current body of continually evolving Title VII sex-discrimination jurisprudence.

253.   Appellees may attempt to excuse their discriminatory behavior toward Vickers by citing the long litany of cases holding that homosexuality is not a protected classification under Title VII.  Vickers does not dispute that homosexuality - real or perceived - is not protected under Title VII.  Vickers' Title VII claim, however, is grounded in the growing awareness among the judiciary - as expressed through the post-*Price Waterhouse* case of *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), which definitively answered the question of whether Title VII's prohibitions against sex discrimination, set out in Title VII of the Civil Rights Act of 1964, apply to same-sex sexual harassment.

254.   In *Oncale v. Sundowner*, Joseph Oncale, a male, filed a complaint against his employer, Sundowner Offshore Services, Inc., alleging that he was sexually harassed by co-workers, in their workplace, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

255.   In a unanimous opinion, the Court held that while Title VII does not prohibit all verbal or physical harassment in the workplace, it does bar all forms of discrimination "because of" sex.  Such discrimination, whether motivated by sexual desire or not, is actionable so long at it places its victim in an objectively disadvantageous working condition, regardless of the victim's gender.  Specifically, the Court held that same-sex sexual harassment is actionable under Title VII.

-70-

## **JURY TRIAL DEMAND**

256.    Vickers respectfully requests a jury trial for any and all issues so triable.

WHEREFORE, Plaintiff Christopher Vickers respectfully asks this Court to:

A)      Award Plaintiff actual money damages, compensatory damages, and

        punitive damages in the aggregate amount of $10,000,000.00;

B)      Award Plaintiff attorney s fees and costs; and

C)      Order such other appropriate relief as the interests of justice may require.

Respectfully submitted,

_____

Thomas W. Watkins (S.Ct. No.0058702)
2515 River Downs
Stow, Ohio 44224
Lead Counsel, Attorney for Plaintiff
330-686-8844 Office
330-686-7730 Fax